## Ezra Kendall v. William H. West.

1. CONTRACTS—*Services to be Satisfactory—Insubordination.*—Where a contract of employment contains a provision that the services to be rendered shall be satisfactory to the employer, the fact of insubordination on the part of the employe in refusing to comply with his reasonable requests will of itself justify the termination of the contract.

2. SAME—*Refusal to Obey Reasonable Orders.*—Refusing to obey the reasonable orders is a good ground for the dismissal of an employe, for in every contract of hiring there is an implied undertaking on the part of the employe to obey the lawful and reasonable commands of his employer.

3. SAME—*What is a Refusal to Obey Orders of an Employer.*—Where the proprietor of a theater made a contract in writing with an actor for his services, by the terms of which the actor undertook to render satisfactory services and the proprietor undertook to pay him for "said satisfactory services" the sum of $250 per week, and subsequently the proprietor requested the actor to shorten the time occupied by his performance, which he refused to do and the proprietor gave him notice of the cancellation of the contract because his services were not rendered satisfactorily, *held*, that the refusal of the actor constituted a sufficient ground for the termination of the contract.

**Assumpsit,** on a contract for services. Appeal from the Circuit Court of Cook County; the Hon. ROBERT W. HILSCHER, Judge, presiding. Heard in this court at the March term, 1901. Affirmed. Opinion filed November 7, 1901.

Kendall v. West.

**Statement.**—The appellant is an actor and is a specialist in what is known as monologue. Appellee is a theatrical manager. A contract in writing was made by which appellee engaged the services of appellant and by which appellant contracted " to perform and act " for appellee at such places and theaters in the United States and Canada as appellee might require for the theatrical seasons of 1898 and 1899. By the terms of the contract appellant undertook " to render satisfactory service." Appellee undertook by the contract to pay for "'said satisfactory services" the sum of $250 per week. The season was specified to begin on or about August 15, 1898, and to continue for not less than thirty weeks.

It was also made a part of said contract that appellee should make appellant " a leading feature " in his company, and that in all advertising done by appellee there should be given to appellant a prominence equal to that given appellee or any other individual of the company. The company managed by appellee was a minstrel company. Appellant began his services at about the time specified, viz., August 15, 1898, and continued therein until November 5, 1898, when they were terminated by appellee. On October 28, 1898, appellee served notice in writing upon appellant that after November 5th following his engagement with the company would be terminated. At different times while appellant was performing his services under the contract he was requested by appellee and by the stage manager of appellee to shorten the time occupied by his performance. This appellant refused to do.

Appellee testified :

" I gave him that notice of the cancellation of that contract because his services were not rendered satisfactorily. He absolutely and positively refused to do his act in twenty minutes.   *   *   *   I requested my stage manager to go and tell him to make his act shorter, as the show was too long, and the act was too long to please my audiences, and that it would be more satisfactory if it was curtailed to twenty minutes, which is long enough for any monologue artist, or any monologue.   *   *   *   I went to him myself,

o

and I said, 'Kendall, I want your act in twenty minutes.'
He said, 'I won't do it in twenty minutes.' He positively
refused to do it. That was during the week in Brook-
lyn, playing at the Grand Opera House. *  *  * About
a week or two weeks prior to October 28, 1898. I did
not give him this notice at that time. *  *  * Mr. Truss,
my manager, and I talked over the matter relative to his
specialty, the length of it, and also having it done in black
face, and we thought it would be a great deal better
to have it in black face. *  *  * I went down to
Baltimore, Maryland, during the fore part of the week,
after he had already opened; *  *  * and I told him
I wanted him to black up, and I wanted his act tried in
black face, to see if it wouldn't be beneficial to my show—
I thought it would—and he absolutely refused to do so.
He said he would not. He simply said, 'I won't black up;
my act can not be done in shape if I black up.' I said,
'Yes, it can be done in shape.' He said he wouldn't do it.
Then my manager and I talked the matter over, talked as
manager and proprietor would naturally do in a business
transaction. *  *  * For these reasons I discharged him.
*  *  * I had seven weeks to book him immediately upon
the following Monday if he wanted it, at a raise of $50 a
week, which he refused to accept; the offer came to both
myself and him. I saw Kendall about it; he wouldn't
recognize it at all; he wouldn't accept it. *  *  * He
could have commenced work on the 6th of November at
$300 a week; I could get him as high as $350. He would
not do it."

Appellant testified:

"I refused to black up, and at certain times I refused to
cut my act. *  *  * I was offered $300 a week or more
after the West company left me. *  *  * I could have
received immediately after reaching New York more than
$250 per week at reputable theaters." *  *  *

Q.  "As a matter of fact, you earned more in dollars
and cents from the time you left Washington up to the end
of the West contract than you would have earned had you
stayed with West under the contract?"

A.  "In dollars and cents, I was paid each week over
the circuit more than Mr. West paid me in dollars and
cents."

Appellant also testified that the advertising which he
was to receive under the terms of his contract with appel-

lee would be worth $250 per week. A witness called by appellant testified as an expert that, in his opinion, the advertising to which appellant was entitled under the terms of the contract was worth $500 per week.

Appellant had received payment in full for services rendered up to the time of the termination of the engagement by appellee. At the conclusion of all the evidence the court directed a verdict for appellee. From judgment thereon this appeal is prosecuted.

JAMES EWARD PURNELL, attorney for appellant.

BULKLEY, GRAY & MORE, attorneys for appellee.

MR. JUSTICE SEARS delivered the opinion of the court.

It can not be contended that anything is due from appellee to appellant as salary contracted to be paid, for the evidence discloses that appellant had been paid in full up to the time when the engagement was terminated by appellee, and that thereafter he received from other companies as much in salary as was provided for in the contract with appellee. The claim for damages by reason of the alleged breach of the contract rests solely upon the supposed value of the advertising which appellee had contracted to provide during the unexpired period covered by the contract, and which, it is contended, would have been of value to appellant in maintaining his reputation as an actor with the public at large.

It will be unnecessary to determine whether the damages thus claimed are sufficiently established and so far capable of being estimated as to be recoverable in an action for breach of the contract, for we are of opinion that there was no actionable breach of the contract by appellee. The contract provided, in effect, that the services to be rendered by appellant were to be so rendered as appellee might direct. The contract can not be otherwise construed. It was not a copartnership. It was an employment of appellant by appellee. Appellee, as proprietor of the enterprise, had the undoubted right to direct its manage-

ment in all reasonable ways.   When he requested appellant
to shorten the time of his performance and appellant
refused so to do, appellee was warranted in terminating
the engagement.   There was evidence to the effect that
there had been complaints by certain patrons of the theater
that the time occupied by appellant was too long.   There-
fore the action of appellee in demanding that the time be
shortened can not be viewed as arbitrary or capricious.
Neither does it appear from the evidence that if the per-
formance by appellant were shortened as requested, he
would not still be " the leading feature" of the company,
as provided by the contract.

There is another reason why the demand of appellee and
the refusal of appellant constitute a sufficient ground for a
termination of the contract.   It is provided by the contract
that the services to be rendered by appellant were to be
" satisfactory services."

There is some conflict in the authorities as to whether,
under like provision, a party to the contract may arbitrarily
declare that he is not satisfied, and upon that ground avoid
the contract.   It is held by many decisions that it is precisely
such right to arbitrarily determine when he is satisfied that
is reserved by like provisions in contracts.   There are other
decisions, however, which hold that the dissatisfaction must
not be capricious and ungrounded or unreasonable, and that
when the services would be satisfactory to any reasonable-
minded person, they can not be capriciously and arbitrarily
determined to be unsatisfactory for the purpose of avoid-
ing the contract.   But we are aware of no decision holding
that when the question of satisfaction with the services is
largely a matter of taste, as here, the party reserving to
himself under the contract the right to have such services
satisfactory, may not determine absolutely whether they
are or are not satisfactory.

We are of opinion that the weight of authority would
sustain the right of appellee to determine under this con-
tract whether appellant's services complied with the contract
in being satisfactory to him or not.   Goodrich v. Nortwick,

43 Ill. 445; Alexis Mfg. Co. v. Young, 59 Ill. App. 226; Crawford v. Mail and Express Co., 163 N. Y. 404.

But if there were no such provision in the contract as to satisfaction with the services to be rendered, yet the very fact of insubordination on the part of the employe in refusing to comply with what appears from all the evidence to have been a reasonable request by the employer, would of itself justify the termination of the contract. Wood on Master and Servant, Sec. 116; Abendpost v. Hertel, 67 Ill. App. 501.

In Wood on Master and Servant, *supra*, the author says:

" Refusing to obey the reasonable orders of the master is a good ground for dismissal from service, for in every contract of hiring there is an implied contract on the part of the servant that he will obey the lawful and reasonable commands of his master."

We are of opinion that the evidence established conclusively that the appellant was not entitled to recover for breach of contract, and therefore that the action of the learned trial court in peremptorily directing a verdict was right.

The judgment is affirmed.